# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Zerorez Franchising System, Inc. and
HSK, LLC d/b/a ZEROREZ,

                        Plaintiffs,

v.

Distinctive Cleaning, Inc. and
Jennifer Carr,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-2326 ADM/BRT

---

Michael H. Frasier, Esq., Rubric Legal LLC, Minneapolis, MN, on behalf of Plaintiffs.

Malcolm P. Terry, Esq., Bernick Lifson, P.A., Minneapolis, MN, on behalf of Defendants.

---

## I.  INTRODUCTION

On February 24, 2015, the undersigned United States District Judge heard oral argument on Plaintiffs Zerorez Franchising System, Inc. (the "Franchisor") and HSK LLC d/b/a ZEROREZ's ("ZEROREZ") (collectively, the "Plaintiffs") Motion for Summary Judgment [Docket No. 53].  Defendants Distinctive Cleaning, Inc. ("Distinctive") and Jennifer Carr ("Carr") (collectively, the "Defendants") oppose the motion.  For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

## II.  BACKGROUND

The Franchisor offers carpet and surface cleaning services with franchisees located throughout the United States.  Compl. [Docket No. 1] ¶ 1.  The Franchisor owns trademark and common law rights in the Zerorez name, and has registered "Zerorez" as a trademark with the U.S. Patent and Trademark Office.  Id.  ZEROREZ is a franchisee with its principal place of business in Richfield, Minnesota.  Id. ¶ 2.  ZEROREZ has been operating in the Twin Cities

metro area since 2005 and has been continuously using the Zerorez trademark.  Kaplan Aff. [Docket No. 64] ¶ 2.

Distinctive is a corporation with its headquarters in Bloomington, Minnesota.  Compl. ¶ 3.  Distinctive offers window cleaning, moving cleaning, post construction cleaning, carpet cleaning, and more.  Terry Aff. [Docket No. 68] Ex. 1.  Carr is Distinctive's owner and day-to-day manager.  Compl. ¶ 4.  The carpet cleaning services of ZEROREZ and Distinctive compete in the Minneapolis and St. Paul metropolitan areas.  Id. ¶¶ 27-28.

**A.  Distinctive's alleged deception**

In April 2012, ZEROREZ discovered online advertisements that stated:  "Zero Rez Carpet Cleaning."  Id. ¶ 33.  These advertisements were displayed in response to Google searches for "Zerorez," "twin cities carpet cleaning," and related phrases.  Id.  The advertisements provided a hyperlink to Distinctive's website.  Id.  The Franchisor sent Distinctive a cease and desist letter on April 20, 2012.  Id. Attach. 1.  The cease and desist letter states that "Zerorez" is a protected mark and Distinctive's unauthorized use of "zero rez" in its advertising is deceptive, confusing, and constitutes trademark infringement.  Id.  The letter additionally states that Distinctive employees or representatives have communicated that Distinctive is "Zerorez" to potential customers.  Id.  The letter concludes by demanding Distinctive cease misrepresenting its affiliation with ZEROREZ and immediately discontinue using the Zerorez mark in its advertising.  Id.

Distinctive argues it responded to the cease and desist letter through counsel on May 14,

2012.[1]  Terry Aff. Ex. 14.  Distinctive's response denies advertising with the Zerorez trademark

and further denies making any representation or affiliation with ZEROREZ to prospective

customers.  Distinctive's response concludes by stating "[w]e trust that the foregoing closes this

matter."  Id.

Plaintiffs clearly did not regard the matter as closed; Plaintiffs continued receiving

reports from confused customers claiming they hired Distinctive when they intended to hire

ZEROREZ.  Compl. ¶ 35.  In January 2013, ZEROREZ discovered that Distinctive was

advertising online with the phrase "ZERO REZ Carpet Cleaning."  Id. ¶ 39.  Shortly thereafter,

ZEROREZ again demanded Distinctive cease and desist using the Zerorez mark in its

advertising.  Id.  Distinctive again responded through counsel, stating that it was not using the

marks "in a trademark sense."  Id. ¶ 40.

Sometime in March 2013, ZEROREZ discovered Distinctive purchased "Zero Rez" and

"Zerorez" as Google keyword search terms.  Id. ¶ 41.  In April 2013, Distinctive advertised with

the phrases "Zero Res" and "Rez Free Carpet Cleaning" in response to Google searches for

"Zero Rez," "carpet cleaning Twin Cities," and similar phrases.  Id. ¶¶ 42-43.  In August 2013,

ZEROREZ hired a private investigator and learned that Distinctive employees represented that it

provided services identical to those offered by ZEROREZ.  Id. ¶ 45.

**B.  Google AdWords and Distinctive's contempt of court**

Plaintiffs allege that Distinctive used Google's AdWords advertising service to create

and display the allegedly infringing advertisements.  AdWords is a customizable advertising

---

[1] Plaintiffs contend that they never received a response to the April 20, 2012 cease and desist letter.  See Compl. ¶ 34; Kaplan Aff. ¶ 11.

3

service  that allows businesses to create advertising campaigns that display specific

advertisements in response to keywords—particular search phrases or terms a user enters into

their Google search.  Rand Aff. [Docket No. 17] ¶¶ 8-9.  When a user makes a Google search,

advertisements typically appear in the top three search results as well as along the right side of

the screen.  Id. ¶ 11.  The AdWords platform allows businesses to edit, pause, delete, or resume

any advertising campaign at any time.[2]  Id. ¶ 9.

## C. The present action

Plaintiffs filed suit on August 26, 2013, alleging violations of the Lanham Act and

Minnesota consumer protection statutes.  Just over a month after the lawsuit was filed, the

parties stipulated that Distinctive and Carr shall not use the protected mark "zerorez" and similar

phrases like "zero rez," "zero rezidue," and "zero res," "in connection with any online, print,

radio, television, metatag, Google ad-word, flyer, pamphlet, or any other advertisement."

Stipulation [Docket No. 6].  The Stipulation expressly permitted Distinctive to use the phrases

"zero residue," "no residue," "0 residue," and "residue free" in any of its advertisements.  Id.

The Stipulation was approved by the Court on October 3, 2013.  Order [Docket No. 7]

("Stipulation Order").

On January 3, 2014, counsel for Plaintiffs, while running periodic Google searches to

verify Distinctive's compliance, discovered a violation of the Stipulation Order.  Frasier Decl.

[Docket No. 18] ¶¶ 1, 2, 6.  Counsel observed that Distinctive had resumed using the prohibited

keywords.  Id. ¶ 5.  After attempting to resolve the issue without judicial intervention, Plaintiffs

---

[2] For a more detailed explanation of AdWords, see the Tenth Circuit opinion in 1-800
Contacts, Inc. v. Lens.com, Inc.,722 F.3d 1229, 1235-36 (10th Cir. 2013).

moved for contempt sanctions on February 28, 2014.  In support of its motion, Plaintiffs

presented a series of screenshots taken between January 3, 2014, and February 27, 2014 showing

that Distinctive was running campaigns using prohibited Google keywords.  Pls.' Mem. Supp.

Mot. Contempt [Docket No. 16] 2-4.  On this evidence, Defendants were found in contempt on

March 14, 2014.  Order [Docket No. 25].  Plaintiffs have not alleged any further violations of the

Stipulation Order or further instances of trademark infringement subsequent to the March 14,

2014 Order.  After a period of discovery, Plaintiffs moved for summary judgment on December

9, 2014.

## III. DISCUSSION

### A.  Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof
> at trial.

On a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party.  <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995).

However, the nonmoving party may not "rest on mere allegations or denials, but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If the nonmoving party presents evidence sufficient to permit a reasonable jury to return a verdict in its favor, summary judgment is inappropriate.  Id.  However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

**B.  Trademark Infringement and False Designation of Origin**

The essence of Plaintiffs' Complaint alleges claims of trademark infringement and false designation of origin.  These claims require proof of trademark ownership and the alleged infringer's use of the mark "in connection with goods or services in a manner likely to cause customer confusion as to the source or sponsorship of the goods or services."  Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1009 (8th Cir. 2011).

Defendants do not challenge Plaintiffs' ownership of the "Zerorez" mark.  Thus, Plaintiffs' claims of infringement and false designation of origin turn on whether Distinctive used the mark in a manner likely to cause customer confusion.  The following six factors guide that determination:

> 1) the strength of the trademark owner's mark; 2) the similarity between the trademark owner's mark and the alleged infringing mark; 3) the degree to which the allegedly infringing services competes with the trademark owner's services; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion.

Id. at 1009 (citing SquirtCo. v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980)).  "These factors do not operate in a mathematically precise formula; rather, we use them at the summary

judgment stage as a guide to determine whether a reasonable jury could find a likelihood of

confusion." Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1096 (8th Cir. 1996).

"Factual disputes regarding a single factor are insufficient to support the reversal of summary

judgment unless they tilt the entire balance in favor of such a finding." Id.

### 1. Strength of the mark

"A strong and distinctive trademark is entitled to greater protection than a weak or

commonplace one." Frosty Treats v. Sony Computer Ent. Am. Inc., 426 F.3d 1001, 1008 (8th

Cir. 2005). A trademark's strength is measured through both conceptual and commercial lenses.

George & Co. v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 200); ConAgra, Inc. v.

George A. Hormel & Co., 784 F.Supp. 700, 708 (D. Neb. 1992) aff'd, 990 F.2d 368 (8th Cir.

1993).

### a. Conceptual

The conceptual strength of a trademark is determined by its classification into one of the

following four categories: generic, descriptive, suggestive, or arbitrary or fanciful. Cellular

Sales, Inc. v. Mackay, 942 F.2d 483, 486 (8th Cir. 1991) (citing Vision Center v. Opticks, Inc.,

596 F.2d 111, 115 (5th Cir. 1979)). Generic marks are not entitled to protection and descriptive

marks are only entitled to protection if they have acquired a secondary meaning.[3] Frosty Treats,

426 F.3d at 1005. Suggestive and arbitrary or fanciful marks garner protection regardless of

whether they have acquired secondary meaning. Id. (citing Co-Rect Prods., Inc. v. Marvy!

---

[3] While not at issue here because "Zerorez" is at least a suggestive mark, "[s]econdary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product. Co-Rect Prods., Inc. v. Marvy! Advert. Photograhpy, Inc., 780 F.2d 1324, 1330 (8th Cir. 1985).

Adver. Photography, Inc., 780 F.2d 1324, 1329 (8th Cir. 1985)).

"A suggestive mark is one that requires some measure of imagination to reach a conclusion regarding the nature of the product." Duluth News-Tribune, 84 F.3d at 1096 (citing Am. Home Prods. Corp. v. Johnson Chem. Co. Inc., 589 F.2d 102, 106 (2d Cir. 1978) (holding that "Roach Motel" is a suggestive mark because "[w]hile roaches may live in some hotels against the will of the owners, motels are surely not built for roaches to live in."). Descriptive marks, in contrast, are those that do not require "imagination, thought, or perception . . . to reach a conclusion as to the nature of its goods." Frosty Treats,, 426 F.3d at 1005 (determining that the mark "Frosty Treats" is descriptive because "Frosty Treats is in the business of selling frozen desserts out of ice cream trucks. 'Frosty Treats' conveys an immediate idea of the qualities and characteristics of the goods that it sells.").

"Zerorez" is at least a suggestive mark. Unlike "Frosty Treats" and other descriptive marks, "Zerorez" requires additional imagination, thought, or perception to convey the nature of the product. "Zerorez" does not immediately convey an idea of the qualities and characteristics of the services that the Plaintiffs sell.

### b. Commercial

In addition to conceptual strength, the mark's commercial value, or marketplace recognition, factors into the strength of the mark analysis. In the likelihood of confusion context, commercial strength is based on the "public recognition and renown" of the mark as shown by the amount of advertising, sales volume, features and reviews in publications, and survey evidence. See, e.g., Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 1374-76 (Fed. Cir. 2005) (considering advertising expenditures, sales

figures, and other factors in commercial strength analysis); ConAgra, Inc., 990 F.2d at 369

(including "marketplace recognition value" in determining strength of trademark).  The relevant

market for the commercial strength evaluation is "the class of customers and potential customers

of a product or service, and not the general public."  Palm Bay Imps., 396 F.3d at 1375.  The

commercial strength inquiry is focused on the marketplace's recognition of the mark at "the time

the mark is asserted in litigation."  Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 867

(D. Minn. 2010) (quoting Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 405 F.

Supp. 2d. 680, 690 (E.D. Va. 2005)).

 "Zerorez" has commercial strength.  The Franchisor has continuously used its mark in the

United States since 2003 and a licensed franchisee has been using the mark in operating its

business in the Twin Cities metro area since 2005.  Compl. ¶¶ 9, 18.  ZEROREZ's market share

has increased from 3% in 2006 to roughly 20% at the time the Complaint was filed.  Id. ¶ 19.

ZEROREZ has been featured in the Minneapolis StarTribune, and the Minneapolis St. Paul

Business Journal has recognized ZEROREZ multiple times for its business growth and job

creation.  Kaplan Aff. ¶ 7.  ZEROREZ has expended significant resources in advertising and

promoting its business.  See Id. Exs. J, K, L (identifying $324, 959 and $1,152,061 in annual

advertising expenditures between 2009 through 2013, respectively).  The strength of the mark

factor weighs in favor of Plaintiffs.

 **2. Similarity**

 The second step considers the similarity between the mark "Zerorez" and Distinctive's

use of "zero rez" and similar permutations.  Frosty Treats, 426 F.3d at 1008.  Courts are to

analyze "similarities of sight, sound, and meaning between two marks."  Gen. Mills, Inc. v.

Kellogg Co., 824 F.2d 622, 627 (8th Cir. 1987).  This analysis should not be completed in a

vacuum; rather, the Court "must attempt to recreate the conditions in which buying decisions are

made, and . . . what a reasonable purchaser in market conditions would do."  Calvin Klein

Cosmetics Corp. v. Lenox Labs., 815 F.2d 500, 504 (8th Cir. 1987).

Distinctive used the phrases "Zero Res," "Zero Rez," and "ZERO REZ" in its online

advertisements.  Llewellyn Aff. [Docket No. 63] ¶ 16.  The advertisements displayed the phrases

in ordinary text free from stylization or other artistic impression that may create distinctness

from the protected mark.  While the phrases themselves are not identical to the protected mark,

the slight difference—using "s" instead of "z" or adding a space between the "zero" and

"rez"—does not save Distinctive.  Without doubt, Distinctive's usages are confusingly similar to

the protected mark.  This factor also favors Plaintiffs.

### 3.  Competitive proximity

The third factor asks the degree to which the infringer's products competes with the

plaintiff.  SquirtCo., 628 F.2d at 1091.  If the two companies' products are closely related,

confusion among customers is more likely.  Davis v. Walt Disney Co., 430 F.3d 901, 904 (8th

Cir. 2005).

ZEROREZ and Distinctive both offer carpet and surface cleaning services in the

Minneapolis, St. Paul metropolitan area.  While Distinctive may offer window washing and other

services that ZEROREZ does not, the alleged infringing use of Plaintiffs' mark is used to solicit

business for Distinctive's carpet cleaning service, which directly competes with ZEROREZ.

This factor also favors Plaintiffs.

### 4.  Intent to confuse the public

The fourth factor analyzes whether the alleged infringer intended to pass off its goods as the trademark owner's goods.  Frosty Treats, 426 F.3d at 1008.  Although proof of misleading intent is not required for success in an infringement claim, "the absence of such intent is a factor to be considered."  Id. (quoting Sensient Techs. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 766 (8th Cir. 2010)).

A reasonable fact finder would conclude Distinctive possessed intent to infringe on Plaintiffs' mark.  Carr knew that ZEROREZ was a competitor to Distinctive's carpet cleaning business.  The evidence includes Carr's decision to purchase "Zero rez" as an AdWords keyword.[4]  Llewellyn Aff. Ex. A.  Distinctive's advertisements that included derivatives of the protected mark were some of its most successful advertisements.  Id. Ex. B.  The success of these advertisements was discussed in an October 7, 2013 email, on which Carr was copied, from Melanie Llewellyn ("Llewellyn"), the individual responsible for Distinctive's advertising.  The email stated:  "But [Carr's] insight was that Zero Rez generated LOTS of leads.  Also, Zerorez was running radio ads on nearly every radio station in the mpls/st paul area, so it really worked well to get the phones ringing."  Fraiser Aff. [Docket No. 55] ("First Frasier Aff.") Ex. 25.  The record additionally reflects that the content of Distinctive's advertisements were repeatedly altered to include the similarities with "Zerorez."  These changes occurred both before and after Distinctive received the first cease and desist letter as well as advice from its counsel directing

---

[4]  This purchase is used only to show that Distinctive was aware that ZEROREZ was a competing carpet cleaning business and not as a source of direct liability.  Plaintiffs' Complaint does not allege that Distinctive's use of AdWords keywords identical or similar to the protected mark, in and of themselves, constitutes trademark infringement.

Distinctive to cease using Zerorez in its advertising.  <u>See</u> Frasier Aff. [Docket No. 70] ("Second

Frasier Aff.") Ex. 27 (showing that advertisements were changed to include similarities to the

protected mark into August 2013).  Moreover, Distinctive's intention is further evidenced by

representations its made to prospective customers, including an email from Distinctive's General

Manager stating:  "We are not the company Zero Res, but we our add say [sic] we do offer the

zero res method."  First Frasier Aff. Ex. 9.  The only reasonable inference is that Distinctive used

the protected mark in an attempt to generate business by passing off Plaintiffs' services as its

own.

　　　Distinctive attempts to evade this conclusion by assigning all evidence of intent to

Llewellyn, who began working for Distinctive around 2008.  Carr Aff. [Docket No. 22] ¶ 3.

This deflection of intent fails because Llewellyn was acting with Distinctive's authority.

Beginning in 2008, Llewellyn's official duties never wavered from being solely responsible for

Distinctive's advertising.  After Llewellyn was fired sometime in early 2014, nobody was

managing Distinctive's online advertising.  Terry Aff. 78 ("Carr Dep.") 33:11-22.  Indeed, Carr

repeatedly testified in her deposition that she herself lacked any knowledge or skill to make

substantive changes to the content of Distinctive's online advertising, and instead relied

exclusively on Llewellyn for those purposes.  <u>See, e.g.</u> Carr Dep. 28:25-29:3; 30:9:24; 41:8-19.

Thus, Llewellyn's actions in managing Distinctive's advertising were made with actual

authority.  <u>See</u> <u>Trustees of the Graphic Comm'ns Intern. Union Upper Midwest Local 1M Health</u>

<u>& Welfare Plan v. Bjorkedal</u>, 516 F.3d 719, 727 (8th Cir. 2008) ("Actual authority is that

authority given by the principal to the agent to act on its behalf, and it requires that the principal

manifest its consent to the agent's ability to bind the principal.") (citing Restatement (Third) of

Agency § 3.01 (2006)).

Distinctive's efforts to paint its advertisements as fair use is equally unavailing.[5] Distinctive's usage of similarities to "Zerorez" do not generally describe a residue free cleaning method but necessarily infer a connection to the Zerorez mark.  Distinctive ran advertisements that used the terms, "Zero Res" or "Zero Rez" closely followed by "Same Results."  See Llewellyn Aff. ¶ 16.  The phrase "Same Results" plainly draws this connection.  This factor weighs in favor of Plaintiffs.

### 5. Degree of care reasonably expected by the customers

This factor evaluates the degree of care expected of an ordinary purchaser.  Duluth News-Tribune, 84 F.3d at 1099.  "In considering this factor, we must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  Luigino's Inc. v. Stouffer Corp., 170 F.3d 827, 831 (8th Cir. 1999).

In this case, consumers are likely to exercise at least a moderate degree of care when selecting a carpet cleaning company.  Carpet cleaning is not an impulsive decision or a quick purchase off the shelf.  Additionally, this type carpet cleaning requires a technician to enter the consumer's home to perform the service.  Inviting a stranger into one's home elevates the ordinary purchaser's degree of care.  As a result, interested consumers are likely to research quality and price before making a purchasing decision.  This factor weighs in favor of Defendants.

---

[5] The Stipulation Order allowed Defendants to use "zero residue," "no residue," "0 residue," and "residue free" in its advertising.  Stipulation Order 2.  Defendants were free to generally describe that their cleaning services did not leave any residue behind.

**6.  Evidence of actual confusion**

"[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion."  Life Technologies, Inc. v. Gibbco Scientific, Inc., 826 F.2d 775, 777 (8th Cir. 1987).  Evidence of actual confusion may be presented in the form of testimony about incidents of confusion or survey evidence.  See Frosty Treats, 426 F.3d at 1009.  In evaluating the evidence at the summary judgment stage, consideration is given only to those responses that are supported by admissible evidence.  Postscript Enterprises v. City of Bridgeton, 905 F.2d 223, 226 (8th Cir. 1990).

Evidence of confusion is documented by Distinctive's call center manager, who "remember[s] receiving many reports of customers telling me they hired or contacted Distinctive Cleaning thinking it was Zerorez" and "remember[s] the call center receiving many calls complaining that they hired Distinctive Cleaning thinking it was Zerorez."  Hicks Aff. [Docket No. 57] ¶¶ 3-4.  This is not an isolated event from one or two confused customers, but rather evidence of repeated customer confusion observed by the very employee tasked with responding to the concerns of confused customers.  This evidence of actual confusion is strong and tips this factor strongly in favor of Plaintiffs.

Viewing the six SquirtCo factors as applied above, no factual dispute exists as to the likelihood of confusion.  Five of the six factors weigh in favor of Plaintiffs.  A likelihood of customer confusion exists as a matter of law.  Thus, Plaintiffs are entitled to summary judgment on its federal trademark infringement and false designation of origin claims.

**C.  Trademark counterfeiting**

Trademark infringement can rise to counterfeiting if the defendant "intentionally used the

14

registered trademark knowing that it was counterfeit." Council of Better Bus. Bureaus, Inc. v. Bailey & Assocs., Inc., 197 F. Supp. 2d 1197, 1219 (E.D. Mo. 2002) (citing 15 U.S.C. §§ 1116(d), 1117(b)). Distinctive's three arguments opposing trademark counterfeiting rehash nearly identical arguments that failed to avoid summary judgment on Plaintiffs' underlying trademark infringement action and are equally unpersuasive here.

Distinctive first argues that it is not liable for trademark counterfeiting because Plaintiffs failed to prove its infringement claim pursuant to 15 U.S.C. § 1114(1). As concluded above, however, Plaintiffs did prove its underlying infringement claim. Distinctive next argues that because Llewellyn exclusively created, managed, and ran Distinctive's advertising campaigns, Distinctive is not liable for her actions. Again, as established above, since Llewellyn was acting with actual authority, Distinctive cannot escape the negative consequences of her actions. Finally, Distinctive claims it cannot be held liable for trademark counterfeiting because it did not use the exact trademarked phraseology, "Zerorez," in its advertisements. This argument is unconvincing because liability for trademark counterfeiting does not require exact mimicry of the protected mark. See George & Co., LLC v. Xavier Enters., Inc., No. 09-2973, 2009 WL 4730331, at *3 (D. Minn. Dec. 4, 2009) (citing 15 U.S.C. §§ 1114(1)(a); 1116(d)(1)(B)) ("The Lanham Act prohibits the use of any . . . 'counterfeit . . . mark in connection with . . . advertising of any goods or services . . . which is likely to cause confusion.' A counterfeit mark is a 'spurious mark which is identical with, or substantially indistinguishable from, a registered mark."). In a January 10, 2013 email, Distinctive's own attorney stated to Carr that "you should not be using the term 'ZEROREZ' in any way, shape, or form in creating your ads. The term is trademarked, and, therefore, cannot be used to create an ad." First Frasier Aff. Ex. 15. Armed

with knowledge that "Zerorez" was trademarked, Distinctive continued its use of terms that were substantially indistinguishable from the trademarked term. See Second Frasier Aff. Ex. 27 (showing that "Zero Rez" and "Zero Res" were used in advertisements after January 10, 2013). Thus, Plaintiffs are also entitled to summary judgment on its trademark counterfeiting claim.

**D. Personal Liability**

Plaintiffs also seek to hold Carr personally liable for Distinctive's use of its protected mark. Plaintiffs argue that Carr is personally liable since she was the active force behind the infringement and she authorized the use of the Zerorez mark. Distinctive responds that the evidence does not support Carr was the driving force behind the infringement. According to Distinctive, Llewellyn's involvement precludes summary judgment because there is a genuine dispute as to Carr's direct involvement in the infringing activities.

Natural persons may be liable for trademark infringement. Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (8th Cir. 1991). "Obviously . . . if there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done." Id. (quoting Mead Johnson & Co. v. Baby's Formula Serv., Inc., 402 F.2d 19, 23 (5th Cir. 1968)). "A corporate officer is personally liable for the corporation's trademark infringement if the officer participates in that infringement." Microsoft Corp. v. Ion Techs. Corp., No. 01-1769, 2003 WL 21356084, at *5 (D. Minn. May 30, 2003) (citing United States v. Wash. Mint, LLC, 115 F. Supp. 2d 1089, 1106 (D. Minn. 2000)).

Carr's representations regarding her involvement in Distinctive's advertising are not consistent. In her deposition, Carr stated she did not have any involvement in creating the text of

Distinctive's advertisements.  Carr Dep. 42:5-43:21.  These statements, however, are belied by her own affidavit, which states that "sometimes I would write the text of advertisements."  Carr Aff. ¶ 4.  Carr also testified in her deposition that it was not her decision to use "Zero Rez" as a keyword nor was she consulted on the decision.  Carr Dep. 78:3-11.  This assertion is contradicted by an email Llewellyn received from Carr directing her to use "zero rez" as a keyword.  Llewellyn Aff. ¶ 7, Ex. A.

In addition to the internal inconsistency of her testimony, Carr's claimed technological inabilities to alter Distinctive's advertisements is directly contradicted by Llewellyn's testimony and supporting emails describing her frustration with the changes Carr made to the content of the advertisements and her alterations to the AdWords platform.  Id. ¶¶ 16, 19, Exs. C, D, F.  Carr and Llewellyn were the only persons who had access to the AdWords account.  Carr Dep. 37:22-38:8.  Carr's insinuation that Llewellyn was surreptitiously changing the advertisements and then blaming Carr for those changes in an effort to frame her liability does little to further her argument.

Even if Carr's inconsistencies are discounted and Llewellyn's testimony is ignored, Carr is still personally liable for trademark infringement because she actively participated in the infringement.  Carr testified that, while she did not manage the AdWords account, she was responsible for managing the AdWords budget and paying the bill.  Carr Dep. 33:19-34:3.  Carr additionally testified in her deposition that she logged into AdWords and managed the budget maybe "every two weeks" after Llewellyn was fired in early January 2014.  Id. 34:9-13.  Indeed, Carr did not hire anyone else to manage AdWords or make any changes to AdWords after she terminated Llewellyn.  Id. 35:4-7.  Combining her role as the owner of Distinctive with

managing the advertising budget, which includes adjusting the cost of specific advertisements, and authorizing payment constitutes active participation.  This active participation renders Carr personally liable for Distinctive's infringement.

**E.  Remaining Claims**

Plaintiffs allege additional Lanham Act violations and their state law equivalents.  These claims are dismissed.  The Court will decline to fully address the merits of these claims, but clearly each suffers from facial deficiencies—"Zerorez" is not a sufficiently famous mark to meet the rigorous standard of a dilution claim and no evidence has been offered to satisfy the interstate commerce requirement of its claims for false statements in advertising and unfair competition.

More significantly, however, is that the continuing adjudication of these claims serves no practical purpose.  While a party may pursue alternative claims in their pleadings, courts have an obligation to "secure the just, speedy, and inexpensive determination" of a trial.  Fed. R. Civ. P. 1.  This includes dismissing redundant claims when necessary.  ACIST Med. Sys., Inc. v. OPSENS, Inc., No. 11-539, 2011 WL 4640884, at *2 (D. Minn. Oct. 4, 2011); N. PCS Servs., LLC v. Sprint Nextel Corp., No. 05-2744, 2007 WL 951546, at *12 (D. Minn. Mar. 27, 2007). The essence of Plaintiffs' Complaint is trademark infringement.  As evidenced from the discussion above, Plaintiffs' trademark infringement claim is ironclad.  Having already established liability for trademark infringement and counterfeiting, Plaintiffs have no need to present alternate theories of liability, which are predicated on the same facts as its primary causes of action.  See Guy Carpenter & Co. v. John B. Collins & Assocs., Inc., No. 05-1623, 2006 WL 2502232, at *9 (D. Minn. Aug. 29, 2006) (dismissing claims predicated on same facts

as duplicative).  Further violations of the Lanham Act will not provide Plaintiffs with further relief and the remedies afforded by the relevant state statutes are duplicative to their federal analogues.

**F.  Damages**

    **1.  Equitable Remedy**

    Plaintiffs request a permanent injunction enjoining Defendants from any continued use of their trademark.  Defendants raise no objection to Plaintiffs' request for a permanent injunction.  Based on the undisputed facts and the determinations set forth above, Plaintiffs are entitled to a permanent injunction.

    The Court may grant an injunction "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office."  15 U.S.C. § 1116(a).  After obtaining success on the merits of a trademark infringement claim, the standard for obtaining a permanent injunction is essentially the same as obtaining a preliminary injunction.  Bank One, Utah v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999).  Plaintiffs must show:  1) they have suffered an irreparable injury; 2) legal remedies such as monetary damages are inadequate to compensate for the injury; 3) the balance of hardships between the plaintiff and the defendant warrant an equitable remedy; and 4) the public interest would not be disserved by a permanent injunction.  Ebay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Roederer, 732 F. Supp. 2d at 880-81.

    "Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [Plaintiffs] can demonstrate a likelihood of customer confusion."  Gen. Mills, 824 F.2d at 625.  Reputational harm and damage

to goodwill are difficult to quantify and monetary damages are generally inadequate to

compensate such injuries.  <u>Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.</u>, 336 F.3d 801, 805

(8th Cir. 2003).  The first two elements are therefore satisfied.

The balance of harms factor also supports entry of a permanent injunction.  Trademarks

vest a registrant with the exclusive use of that mark.  Distinctive's infringement erodes that

exclusivity and harms Plaintiffs.  The public interest further favors an injunction because "the

public interest is served by preventing customer confusion in the marketplace."  <u>Davidoff & CIE,</u>

<u>S.A. v. PLD Int'l Corp.</u>, 263 F.3d 1297, 1304 (11th Cir. 2001).

The Stipulation Order was tailored to curtail infringing activity while permitting

Distinctive to advertise in a manner that does not infringe on Plaintiffs' mark.  However, shortly

after the Stipulation Order was implemented, Defendants resumed advertising with prohibited

terms.  Defendants have repeatedly failed to respect Plaintiffs' trademark rights and have

continuously misappropriated the goodwill of the "Zerorez" mark in an effort to raise revenue.

The Court has wide discretion in fashioning an appropriate equitable remedy to prevent

violations of Plaintiffs' trademark.  Defendants' inability to comply with the Stipulation Order

necessitates a broad injunction that clearly proscribes any similarity or affiliation to the

"Zerorez" trademark.  Therefore, Defendants are permanently enjoined from using the words

"zero," "0," or "residue" in connection with any online, print, radio, television, metatag, Google

ad-word, flyer, pamphlet, or any other advertisement.

To be clear, <u>any</u> use of these words is prohibited.  This includes such expressions as

"Zero chemical cleaning," "no residue carpet cleaning," "residue free cleaning," or

"zerochemical."  If Defendants demonstrate their inability to comply with the terms of this

permanent injunction, in addition to monetary sanctions, the Court will order Defendants to completely cease all forms of advertising for its entire carpet cleaning business.

## 2. Economic Remedy

Upon a finding of trademark infringement, § 1117 of the Lanham entitles a plaintiff, "subject to principles of equity," to recover:  "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  By its very words, the Lanham Act establishes a flexible statutory remedial scheme.  "[T]he district court is given broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty."  Metric & Multistandard Components Corp. v. Metric's Inc., 635 F.2d 710, 715 (8th Cir. 1980).

### a. Distinctive's Profits

Plaintiffs seek to recover Distinctive's profits derived from its carpet cleaning business. Such a remedy is not automatic upon a violation of the Lanham Act.  As the Eighth Circuit has explained:

> If a registered owner proves willful, deliberate infringement or deception, an accounting of profits may be based upon (1) unjust enrichment, (2) damages, or (3) deterrence of a willful infringer.  However, § 35(a) of the Lanham Act does not permit the award of monetary relief as a penalty.  Moreover, because the Act is grounded in equity and bars punitive remedies, an accounting will be denied in a trademark infringement action where an injunction will satisfy the equities of the case.

Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1247 (8th Cir. 1994) (internal citations and quotations omitted).  An accounting of profits should be limited to cases involving bad faith.  See Restatement (Third) of Unfair Competition § 37 cmts. e, f.

The record shows that Distinctive acted in bad faith because its infringement was willful

and deliberate.  Distinctive's infringing activities persisted despite multiple cease and desist letters and advice from its counsel that "Zerorez" should never be utilized for advertising purposes.  Even after stipulating that it would cease using the mark and close approximates in its online advertising, Distinctive continued to infringe.  Moreover, the record reflects that Distinctive's infringement was intended to deceive the public.  Distinctive was advertising with near identical terms to the "Zerorez" mark knowing, as evidenced through the testimony of its call center manager, that its campaign was causing confusion.  Therefore, an accounting of profits is appropriate.

Based on the present record, the Court is unable to accurately determine the amount of Distinctive's profits during the infringement period.  Distinctive argues that its profit and loss statements show that it lost $27,279.84 between 2010 through 2013.  Plaintiffs disagree, arguing that Distinctive's annual profit and loss statements do not clearly show they are entitled to the operating cost deductions Distinctive claims.  Plaintiffs claim they are thus entitled to $259,350, which represents Distinctive's total income of $444,000 from 2010 through 2013 after payroll expenses of $184,647 are subtracted.  Supplemental briefing is required before the Court can accurately determine the profit disgorgement that Plaintiffs are entitled to receive.

### b.  Actual Damages

Plaintiffs argue that they are entitled to the $280,898 ZEROREZ spent in radio and internet advertising to combat the confusion caused by Distinctive's infringement.  Distinctive responds that ZEROREZ has failed to identify any actual damages that are causally related to Distinctive's infringement.

Although Plaintiffs are entitled to recovering their actual damages, recovery must await

amplification of the record.  As it stands, Plaintiffs' request is  supported by the bald assertion

that certain advertising monies were expended "in an effort to clear up the confusion Distinctive

Cleaning created through its advertising campaigns."  Kaplan Aff. ¶ 12.  Notably absent,

however, is any content of the advertisements Plaintiffs claim were created solely to clear up

confusion resulting from Distinctive's infringement.  While ZEROREZ may have spent

$280,898 in advertising following discovery of Distinctive's infringement, the suggestion that

the entire amount was expended <u>only</u> to clear up any confusion, divorced from effort to solicit

new business, is highly doubtful.  Supplemental evidence is therefore required before the Court

can accurately determine the amount of actual damages Plaintiffs are entitled to receive.

### c.  Multipliers and attorney's fees

Plaintiffs finally argue they are entitled to treble damages, due to Distinctive's use of a

counterfeit mark, and attorney's fees.  The Lanham Act authorizes that a court "in exceptional

cases may award reasonable attorney['s] fees to the prevailing party."  15 U.S.C. § 1117(a).  The

Eighth Circuit has held "that when a defendant's unlawful conduct 'was willful and deliberate,

the court may well determine that this is the type of 'exceptional' case for which an award of

attorney's fees is appropriate.'"  <u>Cmty. of Christ Copyright Corp.</u>, 634 F.3d at 1013 (quoting

<u>Metric & Multistandard Components Corp.</u> 635 F.2d at 716).  In cases involving use of a

counterfeit mark, the award of profits or damages shall be tripled unless the court finds

extenuating circumstances.  15 U.S.C. § 1117(b).

This is an exceptional case and Plaintiffs are entitled to an award of reasonable attorney's

fees.  Distinctive's infringement was willful, deliberate, and blatant.  Distinctive received two

cease and desist letters, direct advice from its counsel, and a court order explicitly prohibiting the

use of confusingly similar terms to the protected mark.  Despite the clear and repeated warnings, Distinctive's infringement persisted.  Therefore, an award of reasonable attorney's fees is appropriate.  Given that Defendants' infringement was quite blatant, the Court will closely scrutinize the claimed attorney's fees and will award Plaintiffs an amount that is reasonable under the circumstances.

However, despite the willfulness on the part of Defendants, treble damages are inappropriate.  "While the court may increase damages up to three times the amount of actual damages 'according to the circumstances of the case', such increased damages 'shall constitute compensation and not a penalty.'"  Ford Motor Co. v. B & H Supply, Inc., 646 F. Supp. 975, 998 (D Minn. 1986) (quoting 15 U.S.C. § 1117; Metric & Multistandard Components Corp. 635 F.2d at 715)).  The Court declines to exercise its discretion to multiply Plaintiffs' financial award. Under the present circumstances, the permanent injunction serves as the most effective remedy to curtail any continued infringement.  The parties' submissions clearly demonstrate Plaintiffs financial and marketplace superiority and multiplying any monetary award would impermissibly penalize Defendants for their admittedly willful conduct.  The Court trusts that the permanent injunction will serve to clearly maintain the distinction between the parties' respective businesses if the parties continue to compete in the  carpet cleaning business.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs Zerorez Franchising System, Inc. and HSK LLC d/b/a ZEROREZ's Motion for Summary Judgment [Docket No. 53] is **GRANTED** in part and **DENIED** in part as described herein.

24

1.     As to Count I and the False Designation of Origin claim in Count II of the Complaint [Docket No. 1], Plaintiffs' Motion is **GRANTED.**

2.     As to the remaining claims in Count II and Counts III, IV, V, and VI of the Complaint, Plaintiffs' Motion is **DENIED.**  These claims are hereby **DISMISSED** as duplicative to Count I and the False Designation of Origin claim in Count II.

3.     Defendant Distinctive Cleaning, Inc. and Jennifer Carr are permanently enjoined from using the following terms in connection with any online, print, radio, television, metatag, Google ad-word, flyer, pamphlet, or any other advertising:

   a.     Zero

   b.     0

   c.     Residue

         or any similar derivation thereof, including, but not limited to, "zerorez," "zerorez," and "rezidue."

4.     The parties shall confer and jointly propose a briefing schedule and hearing date on the issues of profits, damages, and attorney's fees.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 5, 2015.